# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEATT CORPORATION, a Nevada corporation; and EXCEED HOLDINGS (PTY) LTD., a South African company,<br><br>  Plaintiffs,<br>vs.<br><br>INNOVATIVE SAFETY TECHNOLOGY, LLC, a California limited liability company; KEVIN HEATH ENTERPRISES, INC., a California corporation; KEVIN HEATH, an individual; and E.V. TECHNOLOGY, a Chinese business entity,<br><br>  Defendants. | CASE NO. 09-CV-1301 - IEG (POR)<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION<br><br>[Doc. No. 35] |

This is a case about alleged trade secret misappropriation. Currently before the Court is Plaintiffs' motion for a preliminary injunction, which seeks to enjoin Defendants (1) from using or disclosing Plaintiffs' trade secrets, (2) from manufacturing or selling the DefNder product in the United States, (3) requiring Defendants to return all of Plaintiffs' trade secrets in Defendants' possession or control, and (4) from competing unfairly with Plaintiffs in any manner. Having considered the parties' arguments, and for the reasons set forth below, the Court **DENIES** the motion with respect to Defendants Kevin Heath, Kevin Heath Enterprises, Inc., and E.V. Technology, but **GRANTS IN PART** the motion with respect to Defendant Innovative Safety Technology, LLC.

**BACKGROUND**

**I.     Factual background**

Plaintiffs Leatt Corporation ("Leatt") and Exceed Holdings (Pty) Ltd. ("Xceed") allege to have spent many years of independent research and development to create neck safety braces for use in motorsports. The effort was spearheaded by the founder of both corporations, Dr. Christopher Leatt, whose personal acquaintance was fatally injured in a motorcycle event in 2000-2001 when he fell and broke his neck. Following the accident, Dr. Leatt allegedly spent over 18 months studying neck injuries and how they were caused in order to develop neck brace protection from these injuries. In or around 2003, Dr. Leatt began working with a designer to create a prototype of his neck brace.

At the same time as Dr. Leatt was working on developing a neck brace for motorcycles, he was also working on a neck brace for cars. This brace, subsequently known as Moto-R, was first sold in or around July/August 2004. At that time, one of the major devices available for neck protection in motorsports and the only device that was approved by the world's top motorsport authority, the Federation Internationale de l'Automobile ("FIA"), was the "HANS" device. According to Plaintiffs, the Moto-R was superior to the HANS device, which apparently made insufficient provision for side impact and did not optimally apply its restraining force in a horizontal direction.

Xceed, formerly known as Leatt Brace Holdings (Pty) Limited ("Leatt Brace"), was established in 2005 and was responsible for the development of safety devices for motorsports, including neck braces or restraint devices. Xceed's main purpose now is ownership of the intellectual property related to the neck braces and restraint devices. Leatt was established in or around May 2005 and was responsible for the commercialization of the safety devices developed by Xceed. Leatt now also assists in the development and manufacture of new safety devices.

During the latter half of 2005 and 2006, after the Moto-R was launched, most of Plaintiffs' efforts were diverted to finalizing the development, manufacturing, and launch of the Moto-GPX, a brace for use with motorcycles. The Moto-GPX brace was launched at the end of 2006, and was enormously successful, largely due to the need for such a product and the absence of any competing protective equipment for the protection of motorcyclists' necks.

At about the same time in 2006, Leatt began commercializing the original Moto-R. However,

while the U.S. safety body approved the Moto-R, it had not yet been approved by the European safety body, the FIA. Accordingly, Leatt focused on improving the Moto-R to a level where it would be approved by the FIA. To that end, a new version of Moto-R was allegedly prototyped in or around the late summer and/or early fall of 2006 ("Prototype 1"). According to Plaintiffs, substantial sums were expended on research and development during 2007 and up to the beginning of 2008. Leatt designed and built a second prototype around the summer of 2007 ("Prototype 2").

Two employees of Leatt, Grant Nelson and Karl Ebel, tested Prototype 2 around August and November 2007 at the Delphi test center in Ohio, after which they traveled to the Dakar Rally in Spain. Both employees worked for Xceed and then Leatt from at least 2005, and both had entered into employment and confidentiality agreements with Leatt on or around May 7, 2007, providing that they would maintain strictly confidential any and all information acquired during their employment by Leatt, including the "know-how as well as any and all result which has been or will be achieved or used with the Project," "the description of the Project," and "any other information which is not publicly available."[1] (See Leatt Decl., Exs. A, B, C, D [Doc. No. 35-3].)

Shortly after their return from the Dakar Rally, both Nelson and Ebel resigned from Leatt. Nelson resigned on January 11, 2008, effective January 25, 2008, and Ebel resigned in early February 2008. Plaintiffs allege that in less than a month after leaving Leatt, Nelson had already designed a prototype of a neck brace with a raised stabilizer bar similar to Prototype 2 ("the DefNder") and had drafted a document for his patent attorney describing his "invention." In March 2008, either Nelson or Ebel reserved a spot at the PRI tradeshow in Florida to launch the DefNder product. Nelson began testing the DefNder by May 2008, branding was complete by June 2008, and pre-orders were being taken by August 2008. In or around June 2008, Nelson, Ebel, and an investor (Doug Williams) formed Defendant Innovative Safety Technology, LLC ("IST"), which listed all three as managers or members. IST is presently in the business of selling safety braces, namely the DefNder. Williams is now the majority shareholder of the IST.

---

[1] The confidentiality agreements also provided several exceptions to the confidentiality obligations, including with respect to the information that: (1) was publicly available, (2) became publicly available without the fault of the receiving party, (3) was lawfully received from any third party, or (4) was "known to or independently developed by the receiving party." (Leatt Decl., Exs. B, D [Doc. No. 35-3].)

In summer or fall of 2008, IST entered into a distribution agreement with Defendant Kevin Heath, who arranged for the DefNder to be manufactured in China and to be imported and sold in the United States. Heath accomplished this through two of his companies: E.V. Technology ("EVT"), a Chinese business entity, and Kevin Heath Enterprises, Inc. ("KHE"), a California corporation. Defendant EVT was to manufacture the DefNder product, while Defendant KHE was to manufacture, import, market, and sell the product. By November 2008, when KHE began to manufacture the DefNder, Heath alleges he had already expended approximately $105,950 on testing, marketing, and obtaining tooling, labor, and other services.

Defendant KHE currently has a contract to sell the DefNder, and is the owner of the <defNderneckbrace.com> domain name. The website located at <defNderneckbraces.com> provides information and advertising for the DefNder product, and also allows online purchases of the DefNder. Defendant Heath also maintains the registration for the <defNder.com> domain name, and personally owns and operates the website at that domain name. The website located at <defNder.com> originally advertised and provided information about the DefNder product, but now only provides a link to the website located at the domain name <defNderneckbrace.com>.

**II.    The South African action**

Plaintiffs first filed suit in South Africa against Nelson and Ebel for misappropriating Plaintiffs' trade secrets and for copyright infringement.[2] On November 21, 2008, Plaintiffs received Anton Piller relief (order of preservation) from the court against Nelson and Ebel, which allowed for seizure of information from Nelson's and Ebel's computers. On December 5, 2008, Plaintiffs received an interdict (similar to a preliminary injunction) against Nelson and Ebel that prohibited them from disclosing, copying, selling, or distributing any of the following features of the Plaintiffs' Prototype 2: (1) "the bowed or convex shape of the bridge sections or 'collar-bone cut-offs' in the load-bearing struts between the wearer's shoulders and the lower end of the belt channels," (2) "the elongated side platforms of the bridge sections on either side of the wearer's neck elevated off the wearer's chest,"

---

[2] It appears the action was filed in South Africa because both Leatt and Xceed have their principal place of business there, and because both Nelson and Ebel are South African citizens. In addition, when Dr. Leatt initially developed the Moto-R and Moto-GPX braces, he filed patent applications for both of them in South Africa and United States. Finally, in April 2008, Nelson also applied to the South African registrar of patents for a patent for the DefNder.

1  (3) "the lateral tethers that extend generally vertically from the neck brace to the wearer's helmet,"
2  and (4) "belt channels defined by walls extending along the sides of the channels, to the proximity of
3  the lower ends of the belt channels." (See Zaitlen Decl., Ex. 3.) In late November 2008, Plaintiffs also
4  filed an action against Williams, among others. On June 11, 2009, Plaintiffs received a similar
5  interdict against Williams. (See id., Ex. 4.) Both of the interdicts also expressly enjoined any sale or
6  distribution of the DefNder product.

7  Plaintiffs allege that on or about January 6, 2009, the day before Nelson and Ebel were ordered
8  to shut down the operation of the <defNderneckbrace.com> website, defendants' counsel contacted
9  Leatt and requested a delay in the enforcement of the order, to which Leatt agreed. On the next day,
10 Nelson and Ebel allegedly transferred the ownership and operation of the domain name and the
11 website to Defendant Heath's third company, Speedworld Indoor Racing. Plaintiffs allege the website
12 is still operating in direct contradiction to the interdicts issued against Nelson, Ebel, and Williams.

13 Subsequently, the South African action was referred to arbitration. Nelson testified during the
14 arbitration, but Ebel and Williams did not. On December 4, 2009, after holding evidentiary hearings
15 over a period of several months and after considering 2,580 pages of transcript, the Arbitrator issued
16 a 202-page decision. (See Zaitlen Decl., Ex. 1 [hereinafter, "Arbitration Award"].) The Arbitrator
17 determined that the overall shapes of Prototype 1 and 2 did not form part of the state of the art as of
18 January 25, 2008. (Id. ¶ 98.) According to the Arbitrator:

> The device of a raised stabiliser bar in particular, located between the upper and lower belt channels, under which the driver's belt or harness is positioned or located by means of the upper and lower belt channels or "*wings*", also did not form part of the state of the art as at [sic] the 25th January 2008. I also conclude that such a stabiliser bar, shaped so that its lower portion, resting on the wearer's chest, incorporates a lower belt channel, designed with the intention of holding the safety belt or harness in place at the position of the lower belt channels, did not form part of the state of the art.

23 (Id.) The Arbitrator then determined that even though the test results of Prototype 2 were unsuccessful
24 and that no further work was specifically carried out on Prototype 2, it "was a step in the process of
25 developing a new generation neck brace," and as such could not be considered of no economic value.
26 (Id. ¶ 112.) Thus, the Arbitrator concluded that even though elements of Prototype 2 were present on
27 the Moto-R device and in other devices available in the marketplace, "there were significant design
28 differences as between Prototype 2 and the prior art," and therefore "the overall design of Prototype

1  2 constituted confidential information." (Id. ¶ 113.)

2  The Arbitrator then identified the following information to have been confidential: (1) test results indicating the developments that were effective and those developments that were ineffective; (2) the fact that Prototype 2 incorporated a series of specific features, even though certain of those features were individually known in the public domain; (3) "the overall shape of the brace;" (4) "the harness channels, their size and the strategic placement thereof;" (5) "the reason for adopting extra large wings;" and (6) the shape and configuration of the stabilizer bars. (Id. ¶¶ 120, 127-28, 130-32.) The Arbitrator also determined that a number of items identified by Plaintiffs could not be considered confidential, including: (1) "design principles applicable in the manufacture of Plaintiffs' neck braces;" (2) "the manner in which such braces are tested and where the accredited test sites are to be found;" and (3) "the use and the placement of tethers generally including lateral and horizontal tethers." (Id. ¶¶ 118, 124, 137.) Finally, the Arbitrator also found that the developments that led to the "open-back" concept and to Prototypes 1 and 2 were not intended to be a "later version" of the closed front Moto-R as released to the public. (Id. ¶ 125.) Indeed, the Arbitrator indicated that it was "highly unlikely" that Prototypes 1 and 2 would have ever been released to the public in the form that they were in at that time. (Id.)

In the end, although there were some differences, the Arbitrator found that the DefNder conceptually resembled Prototype 2, particularly in relation to the stabilizer bar. (Id. ¶¶ 257, 350.) The Arbitrator found that Nelson used his knowledge of the design of Prototype 2 in designing the DefNder, and that such knowledge constituted confidential information proprietary to Plaintiffs. (Id. ¶¶ 348-53.) According to the Arbitrator, the following confidential information was misused by Nelson: (1) the harness channels and their strategic placement, (2) the elevated frontal support bars (the stabilizer bars), and (3) the overall shape of the brace. (Id. ¶ 355.) The Arbitrator also found that Ebel and Williams were liable for aiding and abetting Nelson. (Id. ¶ 362.) Finally, having concluded that the misappropriation provided Nelson with a "springboard" of between 18 and 24 months, the Arbitrator found that justice would be served if Nelson, Ebel, and Williams were enjoined until July 31, 2010 from using or disclosing the above confidential information. (Id. ¶¶ 377, 386.)

///

**III.     Current proceedings**

Plaintiffs commenced the present action in this Court on June 16, 2009. [Doc. No. 1]. After the Court ruled on Defendants' Motion to Dismiss, Plaintiffs filed a First Amended Complaint ("FAC") on September 14, 2009. [See Doc. Nos. 16, 17]. The FAC asserts three causes of action against corporate Defendants IST, KHE, and EV, and the individual Defendant Heath: (1) trade secret misappropriation, (2) unfair competition, and (3) tortious interference.

Currently before the Court is Plaintiffs' motion for a preliminary injunction, filed on February 18, 2010. Defendants Heath, KHE, and EV ("Keath Defendants") filed an opposition, and Plaintiffs filed a reply. The Court heard oral argument on April 13, 2010.

**LEGAL STANDARD**

A party seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., — U.S. —, 129 S. Ct. 365, 374 (2008) (citations omitted); accord Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Indep. Liv. Cntr. of Southern Cal., Inc. v. Maxwell-Jolly, 572 F.3d 644, 651 (9th Cir. 2009) (quoting Winter, 129 S. Ct. at 376) (internal quotation marks omitted).

**DISCUSSION**

**I.     Likelihood of success on the merits**

   A.     <u>Misappropriation of trade secrets</u>

To state a cause of action for misappropriation of trade secrets under the California's Uniform Trade Secrets Act ("UTSA"), a plaintiff must establish two elements: (1) the existence of a trade secret, and (2) misappropriation of the trade secret. AccuImage Diagnostics Corp. v. Terarecon, Inc., 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003); see also CAL. CIV. CODE § 3426.1.

   *i.     Trade secrets*

The Heath Defendants first argue there are no "trade secrets" involved in this case. The UTSA defines a trade secret as "information, including a formula, pattern, compilation, program, device,

1 method, technique, or process, that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." CAL. CIV. CODE § 3426.1(d).[3]

At the outset, the Court rejects the Heath Defendants' arguments that there is no independent economic value to the information Plaintiffs are trying to safeguard, or that Plaintiffs have failed to use reasonable efforts to maintain its secrecy. To have independent economic value, the information must be "'sufficiently valuable and secret to afford an actual or potential economic advantage over others.'" Yield Dynamics, Inc. v. TEA Systems Corp., 154 Cal. App. 4th 547, 564 (2007) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39). "The advantage 'need not be great,' but must be 'more than trivial.'" Id. In the present case, Plaintiffs are attempting to protect disclosure of certain features of Prototype 2, such as the harness channels and their strategic placement, the stabilizer bars, and the overall shape of the brace. (See Pl. Reply, at 3; Leavitt Decl., Ex. B.) According to Plaintiffs, they spent a significant amount of time and resources in developing and testing these features. (See Leatt Decl. ¶¶15-19 [Doc. No. 35-2].) The Arbitrator also found that this information was confidential to Plaintiffs.[4] (See Arbitration Award ¶¶ 120, 127-28, 130-32.)

Information that is kept confidential and that was obtained as a result of a significant expenditure of time and resources undoubtedly has "independent economic value" to its owner. See, e.g., Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc., 923 F. Supp. 1231, 1253 (N.D.

---

[3] In South Africa, whether information constitutes a trade secret is a factual question, and for information to be "confidential" it must be: (1) "capable of application in trade or industry, that is, it must be useful;" (2) "not be public knowledge or property;" (3) "it must be known only to a restricted number of people or a closed circle;" and (4) "be of economic value to the person seeking to protect it." (See Arbitration Award ¶ 56 (citations omitted).)

[4] As the Court indicated at the hearing, even if the Arbitration Award constitutes inadmissible hearsay, it is well-established that the Court may consider hearsay evidence in deciding whether to issue a preliminary injunction. See Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009); Republic of the Philippines v. Marcos, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc). "The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) (citations omitted). Moreover, although the Arbitration Award is not entitled to any preclusive effect, the Court agrees that it should accord at least some persuasive weight to the Arbitrator's considered decision.

Cal. 1995) (noting that independent economic value can be shown by "circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access" (citation omitted)); Courtesy Temp. Serv., Inc. v. Camacho, 222 Cal. App. 3d 1278, 1287 (1990) (noting that a protectable trade secret exists where the information is "procured by substantial time, effort, and expense"). Likewise, information can have independent economic value even if there is no actual product on the market utilizing the information or it relates solely to test failures. See, e.g., Camacho, 222 Cal. App. 3d at 1287 (noting that the definition of a trade secret "'includes information that has commercial value from a negative viewpoint,'" such as "'the results of lengthy and expensive research which proves that a certain process will not work'" (citation omitted)).[5] Accordingly, the design features Plaintiffs are trying to protect in the present case have the requisite "independent economic value."

Likewise, Plaintiffs have sufficiently demonstrated that this information was "subject of efforts that are reasonable under the circumstances to maintain its secrecy." See CAL. CIV. CODE § 3426.1(d)(2). "'Reasonable efforts' can include advising employees of the existence of a trade secret, limiting access to the information on a 'need to know basis,' requiring employees to sign confidentiality agreements, and keeping secret documents under lock." Religious Tech Ctr., 923 F. Supp. at 1253 (internal citations omitted). In the present case, with respect to both employees and non-employees (such as the Delphi test center and the motor sports governing and safety bodies), Plaintiffs allege they entered into confidentiality agreements to safeguard the secrecy of the information. (See, e.g., Leatt Decl. ¶¶ 2-4 [Doc. No. 59].) Obtaining confidentiality agreements amounts to reasonable steps of insuring secrecy. See Religious, Tech. Ctr., 923 F. Supp. at 1253; Am. Credit Indem. Co. v. Sacks, 213 Cal. App. 3d 622, 631 (1989). Moreover, to the extent some of the disclosures were not preceded by a confidentiality agreement, those disclosures appear to have been made only on an "as needed" basis, which is also sufficient to demonstrate reasonable efforts of insuring secrecy. See, e.g., Camacho, 222 Cal. App. 3d at 1288 (reasonable efforts demonstrated where access to the information

---

[5] Indeed, the Arbitrator agreed that even though the test results of Prototype 2 were unsuccessful and that no further work was specifically carried out on it, it "was a step in the process of developing a new generation neck brace," and as such could not be considered of no economic value. (Arbitration Award ¶ 112.)

"was divulged to Employees only on an 'as needed basis' to perform their duties and was limited to the branch office wherein Employees exclusively worked").

Finally, Plaintiffs have also sufficiently alleged that the information in this case is likely not "generally known to the public." See CAL. CIV. CODE § 3426.1(d)(1). In determining whether the information is generally known, the focus is on the information or product as a whole, not its individual components. See San Jose Const., Inc. v. S.B.C.C., Inc., 155 Cal. App. 4th 1528, 1540 (2007); Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514, 1521-22 (1997). In the present case, as the Arbitrator found and the Court agrees, even assuming all of the individual features of Prototype 2 were present in the Moto-R device or any other device available in the marketplace, that does not mean the *combination* of those features was known to or reasonably ascertainable by others in the industry. (See Arbitration Award ¶¶ 113, 127.) Accordingly, Plaintiffs have sufficiently shown that the information at issue here likely constitutes "trade secrets" as defined by the UTSA.

*ii.     Misappropriation*

The Heath Defendants next argue there was no misappropriation of any trade secrets. The UTSA defines "misappropriation" as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>   (A) Used improper means to acquire knowledge of the trade secret; or
>
>   (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>
>     (i) Derived from or through a person who had utilized improper means to acquire it;
>
>     (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
>     (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
>   (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

CAL. CIV. CODE § 3426.1(b). "Improper means" under the UTSA include "theft, bribery,

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Id. § 3426.1(a). Notably, however, "[r]everse engineering or independent derivation alone shall not be considered improper means." Id.

The UTSA makes clear that even if a party does not acquire knowledge of the trade secrets by improper means, it still has "an independent obligation" under the UTSA "to refrain from a tortious invasion of plaintiffs' proprietary rights" if it "knew or had reason to known that . . . the secrets were obtained by a person who owned a duty to plaintiffs to maintain the secrecy." See PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1383 (citations omitted). However, "[u]se of a trade secret without knowledge it was acquired by improper means does not subject a person to liability unless the person receives notice that its use of the information is wrongful." Id. (citations omitted); accord Ajaxo Inc. v. E*Trade Group, Inc., 135 Cal. App. 4th 21, 66 (2005). In the present case, the Heath Defendants argue there was no misappropriation of the trade secrets by Nelson or Ebel, and even if there was, the Heath Defendants did not know or have reason to know of the misappropriation.

First, with respect to Nelson and Ebel, Plaintiffs have sufficiently shown that those individuals likely misappropriated Plaintiffs' trade secrets. As the Arbitrator's reasoned decision demonstrates, both Nelson and Ebel knew that Prototype 2 and the information relating thereto were proprietary and confidential to Plaintiffs, and yet they used and disclosed at least some of those features. (See Arbitration Award ¶¶ 348-55, 362.) The Heath Defendants' arguments to the contrary are unavailing. First, nothing in the UTSA requires that misappropriation consist of taking any *physical* trade secrets. See MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 521-22 (9th Cir. 1993). Second, disclosing or using information in breach of a duty to maintain secrecy constitutes "improper means" under the UTSA. See CAL. CIV. CODE § 3426.1(a). Accordingly, by disclosing and using Plaintiffs' trade secrets in violation of their employment and confidentiality agreements, both Nelson and Ebel likely violated the UTSA. See id. § 3426.1(b).

Second, with respect to the Heath Defendants, Plaintiffs have sufficiently shown they either knew or had reason to know–at least as of December 5, 2008–that the information used to design and develop the DefNder was acquired through improper means. On December 5, 2008 Plaintiffs obtained interdicts against Nelson and Ebel in the South African action, prohibiting them from disclosing,

copying, selling, or distributing certain features of Plaintiffs' Prototype 2. (See Zaitlen Decl., Ex. 3.) The interdict expressly enjoined any sale or distribution of the DefNder product. (Id., ¶ 2.3) Defendant Heath admitted that he learned of the interdict on December 5, 2008. (See Heath Dep. at 156:5-156:17 [Doc. No. 60].) The fact that the actual acquisition of trade secrets by improper means took place *before* that date is irrelevant. Rather, "misappropriation is not limited to the initial act of improperly acquiring trade secrets; the use and continuing use of the trade secrets is also misappropriation." PMC, 78 Cal. App. 4th at 1385 (citing CAL. CIV. CODE § 3426.1). Hence, the fact that Nelson and Ebel misappropriated Plaintiffs' trade secrets *before* the Heath Defendants became involved does not absolve the Heath Defendants of liability for *continuing to use* those trade secrets after they had knowledge of misappropriation. See id. As soon as the Heath Defendants received notice that the DefNder was developed due to wrongful use of Plaintiffs' trade secrets, they should have seized all sales. See id. at 1383.

The Heath Defendants' arguments to the contrary are not persuasive. The Heath Defendants argue they were justified in not stopping the promotion and sale of the DefNder product, even though they were aware of the interdict against Nelson and Ebel, because: (1) the South African interdict was granted under South African law, which is significantly different from California law; (2) Mr. Heath was not a party to the interdict; (3) the interdict was only a temporary remedy, not a final judgment on the matter; (4) Mr. Heath relied in good faith upon the advice of counsel that the South African order was both factually and legally inapplicable to him and his companies; and (5) Mr. Heath's own research on the head and neck restraints in the market confirmed that all of the features incorporated in the DefNder either constitute prior art or are unprotected. However, the UTSA is clear on this point: liability attaches as long as the defendants continue to use the trade secrets (here, the features that make up the DefNder product) *after* they know or have reason to know that the knowledge of those trade secrets derived from a person who had utilized improper means to acquire them (here, breach of the duty to maintain secrecy).[6] See CAL. CIV. CODE § 3426.1(b)(2)(B)(iii); accord PMC, 78 Cal. App. 4th at 1385-86 (noting that the defendants could not avoid liability for the continuing use

---

[6] Contrary to the Heath Defendants' arguments, because Section 3426.1(b) is written in the disjunctive, the liability under it can attach even if notice was received *after* there was material reliance on the trade secrets. See CAL. CIV. CODE § 3426.1(b)(2)(B), (C).

1  of the trade secrets, even though the actual misappropriation of the trade secrets by the co-defendants
2  took place before defendants invested in the company). Accordingly, by continuing to promote and
3  sell the DefNder product after learning of the interdict in South Africa against Nelson and Ebel, the
4  Heath Defendants likely violated the UTSA.

          *iii.      Conclusion*

6        For the foregoing reasons, Plaintiffs have sufficiently shown that they are likely to succeed on
7  the merits of their misappropriation claim.

      B.      <u>Unfair competition and tortious interference</u>

9        As for the unfair competition and tortious interference claims, the Court agrees with the Heath
10 Defendants that Plaintiffs are not likely to succeed on the merits of those claims. The "broad view"
11 is that the UTSA's comprehensive structure and breadth suggests a legislative intent to occupy the
12 field. See <u>K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.</u>, 171 Cal. App. 4th 939, 957
13 (2009) (citing <u>AccuImage</u>, 260 F. Supp. 2d at 953). Accordingly, the UTSA is deemed to preempt
14 common law claims that are "'based on the same nucleus of facts as the misappropriation of trade
15 secrets claim for relief.'" <u>Id.</u> (citing <u>Digital Envoy, Inc. v. Google, Inc.</u>, 370 F. Supp. 2d 1025, 1035
16 (N.D. Cal. 2005)); accord <u>Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.</u>, 318 F. Supp.
17 2d 216, 219-21 (D. Del. 2004) (applying California law).

18       In the present case, "'[a] fair reading'" of Plaintiffs' FAC "'compels the conclusion that each
19 and every cause of action hinges upon the factual allegation that [the Heath Defendants]
20 misappropriated [Plaintiffs'] trade secrets.'" See <u>K.C. Multimedia</u>, 171 Cal. App. 4th at 959 (citation
21 omitted). For example, Plaintiffs base their unfair competition claim on the acts and omissions alleged
22 with respect to the misappropriation claim. (<u>See</u> FAC ¶¶ 113-14.) Likewise, Plaintiffs base their
23 tortious interference claim on the same facts and even allege that the Heath Defendants' acts were
24 "independently wrongful" precisely because they violated the other two statutes (presumably referring
25 to the other two claims). (<u>See</u> <u>id.</u> ¶¶ 117-20, 122.) Accordingly, because Plaintiffs failed to show that
26 these claims are not based on "'the same nucleus of facts'" as the misappropriation claim, these claims

are likely preempted by the UTSA.[7] See K.C. Multimedia, 171 Cal. App. 4th at 957; see also id. at 960-61 (interference with contract claim preempted by the UTSA); id. at 961-62 (statutory unfair competition claim preempted by the UTSA); Digital Envoy, 370 F. Supp. 2d at 1035 (unfair competition claim preempted by the UTSA). Thus, Plaintiffs cannot show that they are likely to succeed on the merits of their unfair competition and tortious interference claims.

## II. Likelihood of irreparable harm

Plaintiffs also assert that failure to grant a preliminary injunction would result in irreparable harm to them that cannot be remedied by a monetary award. Contrary to Plaintiffs' arguments, however, there is no presumption of irreparable injury even if the plaintiff demonstrates that it is likely to succeed on the merits. See Pac. Aerospace & Elecs., Inc. v. Taylor, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003). In addition, the Supreme Court recently clarified that because injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," a preliminary injunction may not be granted based on a mere "possibility" of irreparable harm. Winter, 129 S. Ct. at 375-76 (citation omitted).

As an initial matter, the Court rejects the Heath Defendants' argument that there is no irreparable injury due to Plaintiffs' undue delay in bringing this action and in bringing the motion for a preliminary injunction. Plaintiff's long delay before seeking a preliminary injunction may imply a lack of urgency and irreparable harm. Miller v. Cal. Pac. Med. Ctr., 991 F.2d 536, 544 (9th Cir. 1993). However, in the present case, the Court is satisfied that Plaintiffs have diligently pursued this action, and that any delay was justified by the need to first ascertain who was responsible for the alleged misappropriation, and then to allow the arbitration proceedings in South Africa to run their course.

Nonetheless, the issue of delay aside, Plaintiffs cannot demonstrate a likelihood of irreparable harm if a preliminary injunction is not granted. Plaintiffs correctly argue that "[p]ublic disclosure of a trade secret destroys the information's status as a trade secret. This harms the trade secret owner by both depriving him of a property interest, and by allowing his competitors to reproduce his work

---

[7] Plaintiffs' reliance on Postx Corp. v. Secure Data in Motion, Inc., No. C 02-04483 SI, 2004 WL 2663518 (N.D. Cal. Nov. 20, 2004), is inapposite because there the misappropriation claim was previously dismissed due to pleading infirmities, and the court also found that the unfair competition claim was *not* based on "precisely the same nucleus of facts." See id. at *3.

1  without an equivalent investment of time and money." See Saini v. Int'l Game Tech., 434 F. Supp.
2  2d 913, 919 (D. Nev. 2006) (internal citations omitted). However, there can be no irreparable injury
3  where the "detrimental effects [complained of] have already taken their toll." Miller, 991 F.2d at 544.
4  In the present case, the DefNder has already been on the market for more than a year, therefore it is
5  unclear whether an injunction at this time would have any effect in protecting Plaintiffs' confidential
6  information. See Sky Capital Group, LLC v. Rojas, No. 1:09-CV-00083-EJL, 2009 WL 1370938, at
7  *12 (D. Idaho May 14, 2009) (finding that any injury suffered was not irreparable because it "has, to
8  a large extent, already been incurred and is recoverable through a monetary award"). Similarly, the
9  Court is not persuaded that there is irreparable harm due to the fact that once Leatt does produce its
10 own neck brace, the public will erroneously believe that Leatt has copied the DefNder product. Since
11 the DefNder is already on the market, this harm would occur whether or not the Court grants a
12 preliminary injunction. The grant of an injunction at this late stage cannot "unring the bell," so to
13 speak. Rather, Plaintiffs' remedy lies in prevailing on the merits and then seeking damages for lost
14 profits and for loss of good will and reputation, if any.

15        Plaintiffs also correctly argue that "intangible injuries, such as damage to ongoing recruitment
16 efforts and goodwill," can qualify as irreparable harm. See Rent-A-Center, Inc. v. Canyon Television
17 & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991); see also Tracer Research Corp. v. Nat'l.
18 Envtl. Serv. Co., 843 F. Supp. 568, 578-79 (D. Ariz. 1993) (listing damage to reputation and good
19 will, as well as possible confusion in the marketplace and among customers, as factors supporting the
20 finding of irreparable harm). However, a court may deny a preliminary injunction where the
21 allegations of intangible injury are speculative or unsupported by evidence. See, e.g., Calence, LLC
22 v. Dimension Data Holdings, PLC, 222 Fed. App'x 563, 566 (9th Cir. 2007) (unpublished decision)
23 (affirming denial of a preliminary injunction where the allegations of injury to good will were
24 unsupported by evidence). In this case, the Arbitrator specifically found that it was "highly unlikely"
25 that Prototypes 1 and 2 would have *ever* been released to the public in the form that they were in at
26 that time. (Arbitration Award ¶ 125.) Moreover, to date, Plaintiffs have provided no indication if or
27 when either of these prototypes will be released. Accordingly, if Plaintiffs never release Prototypes
28 1 and 2 to the public, any injury to their good will and reputation, as well as any loss of future

1  customers, is merely speculative and insufficient to support a finding of irreparable injury. See
2  Goldie's Bookstore, Inc. v. Super. Ct., 739 F.2d 466, 472 (9th Cir. 1984) (finding no irreparable injury
3  where the plaintiff's allegations that it would lose good will and "untold" customers were speculative).
4  In any event, Plaintiffs' argument that they will suffer a market disadvantage because Defendants
5  "improperly beat them" to the market appears to be "merely a generalized threat of lost revenue,
6  which can be adequately redressed by monetary relief." See Ossur Holdings, Inc. v. Bellacure, Inc.,
7  No. C05-1552JLR, 2005 WL 343440, at *8 (W.D. Wash. Dec. 14, 2005) (citation omitted).
8       Accordingly, Plaintiffs cannot demonstrate a likelihood of irreparable harm.

9  **III.    Balance of hardships**

10       In asserting that the balance of hardships tips in their favor, Plaintiffs argue that defendants
11  who build "a business based upon a clear violation of the trade secrets and employment agreements
12  . . . cannot defeat a preliminary injunction by claiming the business will be harmed" if the defendants
13  must respect those trade secrets and agreements. See Pac. Aerospace, 295 F. Supp. 2d at 1198-99.
14  Plaintiffs' argument, however, is unavailing. Unlike the defendants in Pac. Aerospace, the Heath
15  Defendants did not personally violate any confidentiality agreements in manufacturing and selling the
16  DefNder product, nor have Plaintiffs demonstrated that the Heath Defendants were personally
17  involved in acquiring the trade secrets by any improper means.

18       In the present case, the balance of hardships does not appear to weigh heavily in either
19  direction. On the one hand, the Heath Defendants argue an injunction would be detrimental to their
20  business in that it would force them to cease operations and fire all of the employees, and would also
21  negatively impact over 70 independent retailers and distributors. (Heath Decl. ¶ 14.) On the other
22  hand, Plaintiffs point out that the Heath Defendants collectively employ only three other employees
23  (although there is also an unspecified number of subcontractors), and that there are other products
24  those companies manufacture besides the DefNder product (although the percentage for that appears
25  to be minuscule compared to the DefNder product). (See, e.g., Heath Dep. at 15:16-15:24, 17:16-
26  20:20, 39:10-40:7, 165:24-166:4, 222:4-222:11 [Doc. No. 60].) In addition, to date, the Heath
27  Defendants have not made any profit from the DefNder sales, and Mr. Heath admitted that instead of
28  pursuing changes to the DefNder product, the Heath Defendants were likely to just redesign the whole

unit in the near future. (See id. at 107:1-107:19, 164:25-165:5.) Having considered the parties' arguments, the Court finds that the balance of hardships does not weigh in either party's favor.[8]

**IV.    Public interest**

As a final factor, the Court has to consider the public interest. "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" Winter, 129 S. Ct. at 376-77 (citations omitted). Plaintiffs allege there is a strong public interest in protecting trade secrets. See, e.g., Bank of Am. v. Lee, No. CV 08-5546 CAS (JWJx), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008); Gable-Leigh, Inc. v. N. Am. Miss, No. CV 01-01019 MMM (SHx), 2001 WL 521695, at *20 (C.D. Cal. Apr. 13, 2001). The Heath Defendants, on the other hand, allege the public interest weighs against issuing an injunction where it would have a negative impact on non-parties, such as the Heath Defendants' 70 independent retailers and distributors. See, e.g., Sammartano v. First Judicial Dist. Ct., 303 F.3d 959, 974 (9th Cir. 2002); Atari, 869 F. Supp. at 792. Having considered the parties' arguments, the Court finds that this factor also does not weigh in either party's favor.

**CONCLUSION**

Accordingly, because Plaintiffs failed to demonstrate that they are likely to suffer irreparable harm if a preliminary injunction is not granted, and because the balance of hardships and public interest factors do not weigh in either party's favor, the Court **DENIES** Plaintiffs' motion for a preliminary injunction with respect to the Heath Defendants. See Winter, 129 S. Ct. at 375-76.

On the other hand, because Defendant IST failed to oppose the motion, the Court **GRANTS IN PART** the motion for a preliminary injunction with respect to IST. See CIV. L.R. 7.1(f)(3)(c). Specifically, the motion is GRANTED to the extent that it seeks to enjoin IST from using or disclosing Plaintiffs' trade secrets, and from manufacturing or selling the DefNder product in the United States. However, because Plaintiffs failed to show that any *physical* trade secrets were misappropriated, the

---

[8] The Court, nonetheless, does reject the Heath Defendants' argument that Plaintiffs are not entitled to any relief due to their unclean hands. The Heath Defendants allege that Dr. Leatt has been convicted of fraud in South Africa and that Leatt has been investigated by the SEC for an alleged pump-and-dump scheme. However, for the doctrine of unclean hands to apply, there must be a relationship between the alleged wrongdoing and the claims. See Blain v. Doctor's Co., 222 Cal. App. 3d 1048, 1060 (1990). In the present case, a review of Dr. Leatt's deposition fails to disclose any such relationship. (See, e.g., Leatt Dep. at 158:19-162:18, 222:12-223:17 [Doc. No. 60].)

motion is DENIED to the extent it seeks to require IST to return all of Plaintiffs' trade secrets in IST's possession or control. Likewise, because Plaintiffs cannot demonstrate that they are likely to succeed on the merits of their unfair competition claim, the motion is DENIED to the extent it seeks to enjoin IST from "competing unfairly" with Plaintiffs in any manner.

**IT IS SO ORDERED.**

**DATED: April 15, 2010**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**